IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

KEITH BUCKMASTER,                    *

    Plaintiff,                   *

    v.                           *

THE NATIONAL RAILROAD            *        Civil Action No. RDB-19-3203
PASSENGER CORPORATION d/b/a
AMTRAK,                          *

    Defendant.                   *

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

## MEMORANDUM OPINION

Plaintiff Keith Buckmaster ("Buckmaster") brings this employment discrimination case against the National Railroad Passenger Company, doing business as Amtrak, alleging assorted violations of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*; the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.*; the Maryland Fair Employment Practices Act, Md. Code Ann., State Gov't § 20-601 *et seq.*; and the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq.* Buckmaster is a former Amtrak employee who was terminated after being formally disciplined for poor performance and taking fifty-eight days of paid absence without providing documentation to substantiate his need for medical leave, as required by Amtrak policy. (Buckmaster's Resp. Opp. 11, 15, ECF No. 52; Amtrak's Mem. Supp. 1–2, 5, ECF No. 51-1.) He now claims that Amtrak discriminated against him on the basis of his disability, interfered with his right to seek FMLA leave, failed to reasonably accommodate his back and neck injuries, and retaliated against him for requesting medical leave and reporting disability discrimination. (Resp. Opp. 1–2.)

Now pending is Amtrak's Motion for Summary Judgment (ECF No. 51). In support of this motion, Amtrak contends that Buckmaster offers no evidence of discrimination or retaliation, beyond his "own subjective speculation and personal disagreement with Amtrak's legitimate business decision to . . . terminate his employment." (Mem. Supp. 2.) Amtrak also contends that Buckmaster failed to timely submit his medical documentation in compliance with the FMLA, despite multiple intervening extensions and warnings by Amtrak. (*Id.* at 2–3.) The parties' submissions have been reviewed and no hearing is necessary. *See* Local Rule 105.6 (D. Md. 2021). For the reasons set forth below, Amtrak's Motion for Summary Judgment is **GRANTED.**

## BACKGROUND

### I.    Amtrak's Antidiscrimination and Family and Medical Leave Act Policies

Defendant National Railroad Passenger Company, commonly known as Amtrak ("Amtrak"), runs passenger trains throughout the United States, operating over 21,000 miles of track in 46 states and the District Columbia. (Ex. A, Decl. of LaToya Warner ["Warner Decl."] ¶ 3, ECF No. 51-2.) As a nationwide employer and a recipient of federal funds, Amtrak maintains several policies that prohibit workplace discrimination in compliance with federal statutes, including: (1) Amtrak's Standards of Excellence; (2) an Anti-Discrimination and Anti-Harassment Policy; (3) a Reasonable Accommodation Policy; and (4) a Family and Medical Leave Act policy. (*Id.* ¶¶ 4, 6–9, Ex. 1, 3, 4, 5, 6; *see* Dep. of LaToya Warner ("Warner Dep.") 24:19–25:1, 30:2–24, 63:7–12, ECF No. 51-10.)

As relevant here, the latter policy requires employers "to provide a completed medical certification from a health care provider" as a prerequisite to taking leave under the FMLA.

(FMLA Policy 000060, ECF No. 51-2 Ex. 6.) "Failure to timely submit documentation required by Amtrak or submitting inaccurate or incomplete documentation may result in leave being delayed or denied." (*Id.*; *see also* Warner Dep. 63:21–64:2 (attesting that an employee who fails to comply with the FMLA policy "can be held to the national attendance policy" or "separated from the organization")) However, Amtrak places employees on leave pending documentation following three to five workdays' absence and communication of the medical issue to a supervisor. (Warner Dep. 68:10–15.) Amtrak has previously provided FMLA leave to two of Buckmaster's co-workers who submitted the medical documentation required by Amtrak's FMLA policy. (Mem. Supp. 8 n.3; *see* Amtrak's Objections and Responses to Second Set of Interrogs. No. 2, ECF No. 51-9.)

## II.    Buckmaster's Employment with Amtrak

Plaintiff Keith Buckmaster ("Buckmaster") is a former Amtrak employee, and a resident of Lincoln University, Pennsylvania. (Compl. ¶ 3, ECF No. 1.)[1] Amtrak hired Buckmaster in 2009 as a Substation Electrician based in Philadelphia's 30th Street Station. (Pl.'s Dep. ["Buckmaster Dep."] 16:24–17:3, ECF Nos. 51-3, 52-2; Amtrak's First Supp. Resp. to Pl.'s First Set of Interrog. No. 16, ECF No. 51-4.) Buckmaster claims, and Amtrak does not contest, that he has suffered from back and neck pain since either 2005 or 2007. (Buckmaster Dep. 92:8–11.) Buckmaster also suffers from recurring kidney stones: He was diagnosed with kidney stones in 2011 and 2013, and he received surgery for this condition four times during

---

[1] Although Buckmaster is a Pennsylvania resident, venue is proper in this district because "the claims and significant activities associated with the claims took place in this judicial district, and [Buckmaster] performed his work for [Amtrak] in this judicial district." (Compl. ¶¶ 7–8); 28 U.S.C. § 1391(b). Amtrak acknowledges that the District of Maryland is a proper venue for this action. (Ans. ¶ 7; ECF No. 12.)

his employment with Amtrak. (*Id.* 84:4–24.) Buckmaster was terminated on November 30, 2017, after failing to timely submit medical documentation for fifty-eight days of paid absence on account of his kidney stones. (Termination Letter, ECF No. 52-25.)

In August 2011, Buckmaster was in a car accident while driving an Amtrak vehicle, and received back, neck, and knee injuries. (*Id.* 19:20–21, 93:2–12, 95:5–7, 143:13–16.) He was hospitalized for a week after the wreck, and then took a leave of absence in full compliance with Amtrak's FMLA policy. (*Id.* 19:20–24, 21:4–6; *see also* Warner Decl. Ex. 7.) Amtrak also sent Buckmaster to the Laser Spine Center in Tampa Bay, Florida, for surgery. (Buckmaster Dep. 97:13–24.) Despite this treatment, Buckmaster began to experience lingering neck and back pain when standing or sitting in one position for too long. (*Id.* 93:2–12, 97:13–98:19.) Buckmaster requested reassignment to a position that would better accommodate his lingering neck and back injuries. (*Id.* 21:2–12; Amtrak First Interrog Resp. No. 16; *see also* Warner Decl. Ex. 8.)

In 2013, Amtrak granted Buckmaster's reassignment request, and transferred him to a less physically demanding Safety Trainer role with Specialist Training and Development in Philadelphia, Pennsylvania. (Buckmaster Dep. 21:2–12, 23:9–11; Amtrak First Interrog Resp. No. 16; Warner Decl. Ex. 8.) In this position, Buckmaster initially reported to an Amtrak employee named Debbie Pirrami. (Buckmaster Dep. 93:2–94:8.) At the time of his transfer, Buckmaster informed Pirrami that he could not stand in one position or drive for long periods of time without aggravating his injuries—and requested assurances that he would spend less than 50% of his time on the road. (*Id.* 95:12–96:7, 104:15–22.) Pirrami allegedly informed him that he would not be required to stand for eight hours each day, that there is never only one

4

trainer in a single location, and that nobody was ever asked to spend half their hours travelling. (*Id.* 95:19–96:7.) Buckmaster did not bring up any potential limitations regarding the distance of his commute. (*Id.* 96:8–22.)

In July 2015, Buckmaster applied for and received a Senior Technical Trainer position with the Safety Training organizational unit in Baltimore, Maryland. (*Id.* 37:24–38:6; Warner Decl. Ex. 8.) In this new position, Buckmaster provided remote training to "all employees over the United States," with limited travel to Philadelphia, Lancaster, Baltimore, and other locations over a two-year span. (Buckmaster Dep. 39:2–8.) The Safety Training unit dissolved in February 2017, at which time Buckmaster was laterally transferred to a Senior Technical Trainer role with the Engineering Department in Philadelphia. (*Id.* 40:14–41:3; *see also* Amtrak First Interrog. Resp. No. 16.) Around this time, Richard Misner, a trainer assigned to the Baltimore location, took an extended leave. (Kevin McCarthy's Dep. ["McCarthy Dep."] 18:3–19:1, ECF No. 51-5.) Buckmaster periodically covered Misner's training courses in Baltimore but did not change his primary work location. (*Id.* 17:7–18:12, 20:3–22.)[2] He claims that travelling to Baltimore exacerbated his back pain, and that other trainers in comparable positions were transferred to be closer to home, despite his comparative seniority. (Buckmaster Dep. 23:2–24:6, 26:1–22.)

## III.    Buckmaster's Performance Issues

Beginning in March 2017, Buckmaster was supervised by Kevin McCarthy. (McCarthy Dep. 12:1–22; Buckmaster Dep. 42:13–23; Amtrak First Interrog Resp. No. 16.) McCarthy

---

[2] McCarthy claims Buckmaster volunteered to cover Misner's training courses, (McCarthy Dep. 18:3–19), while Buckmaster claims that he was forcibly reassigned to this position, (Buckmaster Dep. 44:9–5). Although this factual issue is disputed, it is unnecessary to resolve this case.

insists that Buckmaster "never discussed back pain or the burden of driving to Baltimore" with him. (McCarthy Dep. 19:3–24.) Buckmaster claims that he informed McCarthy of his neck and back injuries, and asked Amtrak to appoint another trainer, reduce his driving load, or grant permission to work from home, but was told these requests "would never happen." (Buckmaster Dep. 99:3–22, 142:12–23, 143:12–20; Buckmaster's Ans. to Amtrak's First Set of Interrogs. No. 13.) He contends that McCarthy "made [him] do more work than . . . one single person could do alone," and that he refused to grant any of these requests despite knowledge of the physical toll that the position was exacting on Buckmaster. (Buckmaster Dep. 140:22–141:3; Buckmaster's First Interrog. Ans. Nos. 13–14.) He claims that he informed McCarthy he was experiencing discrimination, and that McCarthy responded: "Yes, I know." (Buckmaster's First Interrog. Ans. No. 18.)

Shortly following his transfer, McCarthy began to express concerns with Buckmaster's performance. (Declaration of Kevin McCarthy ("McCarthy Decl.") ¶¶ 5–9, ECF No. 51-6.) According to McCarthy, Buckmaster was late to work on McCarthy's first day as Buckmaster's supervisor and fabricated an excuse for his tardiness. (McCarthy Dep. 12:13–18; McCarthy Decl. ¶¶ 5–8.) On March 7, 2017, Buckmaster was issued a formal counseling statement for this incident. (First Counseling Statement, ECF No. 52-7.) Through this document, McCarthy instructed Buckmaster to keep a schedule for McCarthy's review, and to arrive in advance of his classes with sufficient time to prepare. (*Id.*) According to Amtrak, and to McCarthy, Buckmaster did not object to this counseling statement or challenge it as discriminatory and did not suggest that his medical conditions prevented him from meeting these expectations. (McCarthy Decl. ¶ 11; McCarthy Dep. 19:12–20:1; *see also* Buckmaster Dep. 33:17-20.)

Buckmaster's performance continued to decline. On May 16, 2017, McCarthy sent Buckmaster a Counseling Letter and Final Warning. (McCarthy Decl. ¶ 14; Final Warning, ECF No. 51-6 Ex. 4.) This document warned Buckmaster that a failure to improve on his performance deficiencies could result in further disciplinary action, including termination. (*Id.*) Buckmaster claims that McCarthy verbally confirmed that the purpose of the writeups was "to mess with [him] and get rid of him," (Buckmaster First Interrog. Ans. No. 14), while McCarthy alleges that Buckmaster "would schedule training classes without approval, leave work early without notification, provide inaccurate information, and even failed to elevate a harassment complaint as instructed." (McCarthy Decl. ¶¶ 12–13.)

On August 10, 2017, Steven M. Laidslaw, Director of Training and Development for Amtrak's Engineering Department, started an email chain to discuss Buckmaster's performance. (Termination Emails, ECF Nos. 57-1, 58 *SEALED*.) In response to this chain, McCarthy documented several occasions on which Buckmaster scheduled training classes without his supervisor's approval, dismissed those classes early, or left work entirely without proper notification. (McCarthy Decl. ¶ 13; Incident Notes, ECF No. 51-6 Ex. 3.) These notes are supported by contemporaneous documents. Among them: (1) on April 28, 2017, Amtrak employees discussed an incident in which Buckmaster allegedly informed new hires that they could avoid travel obligations by filling out hardship letters, (McCarthy Decl. at 000453–54); (2) on June 29, 2017, Buckmaster provided McCarthy with rosters for a training course the previous week that appeared to be altered with whiteout and marker, (*id.* at 000349–51.); and (3) on September 29, 2017, Buckmaster incorrectly informed a trainee class that a ten-foot ladder requires fall protection, prompting confusion among Amtrak's senior management. (*Id.*

at 000400–02, 000434–38.) This latter incident prompted Laidslaw to initiate the termination process. (Termination Emails 3.)

### IV. Buckmaster's Medical Leave

On Monday, October 2, 2017, at 5:56 a.m., Buckmaster sent McCarthy a text message that he would "be out of work a few days" due to recurrent kidney stones. (McCarthy Decl. ¶ 16.) That evening, Buckmaster sent McCarthy another text message stating that he was in "too much pain" to come in the next day. (McCarthy Decl. ¶¶ 16-17; McCarthy Dep. 22:2–23:3.) According to McCarthy, this was the first time he had heard of Buckmaster's kidney stones— and the last time Buckmaster communicated with him prior to his termination. (McCarthy Decl. ¶ 18.) Thereafter, Buckmaster began a leave of absence that would last for fifty-eight days and conclude with his termination on November 30, 2017. (*See* Termination Letter, ECF No. 52-25.)

Buckmaster completed a Request for Leave of Absence on October 17, 2017, seeking FMLA leave retroactive to October 2, 2017. (Request for Leave, ECF No. 52-9.) He did not state a reason for this request beyond "short term disability." (*Id.*) The Leave Management team activated Buckmaster's short-term disability package, and on October 13, 2017, Amtrak sent Buckmaster an FMLA Eligibility Notice with an attached Certification of Health Care Provider, to be completed and returned by October 28, 2017. (*See* FMLA Eligibility Notice, ECF No. 51-3 Ex. 4.) This Notice also advised Buckmaster that a failure to provide the requested medical documentation by October 28, 2017 could result in the denial of leave and disciplinary action "consistent with Amtrak attendance policies." (*Id.*)

Buckmaster did not timely submit a completed Certification of Healthcare Provider. On Monday, October 30, Buckmaster emailed Amtrak Leave Management indicating that his physician would submit the paperwork following his scheduled MRI on Wednesday, November 1, 2017. (Extension Request Email, ECF No. 52-19.) Amtrak granted Buckmaster a 13-day extension until Friday, November 10, 2017 to provide this documentation. (McCarthy-Battle Email, ECF No. 52-16.) When Buckmaster failed to meet this deadline, Amtrak counselled him to submit his certification and warned him of potential consequences. On November 20, Amtrak advised Buckmaster that he had failed to meet his deadline and warned him of the risk of adverse employment actions if he did not promptly submit his documentation. (Warner Decl. 000270; Documentation Warning Email, ECF No. 51-3 Ex. 7.) On November 29, Amtrak Leave Management sent a letter to Buckmaster, informing him that his request for FMLA Leave for "Unspecified Reason" was denied due to his "fail[ure] to provide [a completed] Certification of Health Care Provider." (Denial of FMLA Leave, ECF No. 51-3 Ex. 8.)

Buckmaster attributes these delays to his health care provider and insurance company. He attributes his delays to issues scheduling his MRI, (Buckmaster Dep. 116:7–21), and claims that Leave Management told him it would be fine if he submitted his paperwork in December, (*id.* 118:10–15). He also claims that he was told any medical certification must be submitted by his doctor, (*id.* 123:4–5), and that his physician confirmed that she had faxed the requisite information to Amtrak on November 18, 2017, (*id.* 118:17–119:9, 122:10–16, 123:4–5.) He further notes that he informed Leave Management that he was having issues obtaining necessary paperwork from his insurance company, (Extension Request Email), and that he

had emailed Leave Management on October 31, 2017, but had failed to submit the correct medical certification form, (Separation Policy Email, ECF No. 52-20).

As Buckmaster was attempting to procure paperwork for his FMLA leave, McCarthy pressed for his termination. During Buckmaster's absence, McCarthy wrote to Amtrak on several occasions to inform them that Buckmaster was not at work, to ask how long Buckmaster had to provide FMLA documentation before action could be taken, and to request that he be "subject[ed] to action consistent with Amtrak attendance policies." (*See* McCarthy Termination Emails, ECF Nos. 52-13, 52-16, 52-17, 52-18.) On November 29, Joan Panik, an employee with Amtrak's Human Resources, listed Buckmaster as one of three individuals with "performance and/or behavior issues" and asked whether it would be possible to "move aggressively" with his termination. (Panik Email, ECF No. 52-14.) On November 28, Julia Costello, a Senior Manager with Employee Relations, noted that "[Buckmaster's] managers would like to move forward with termination." (Costello Email, ECF No. 52-15.) Buckmaster was terminated on November 30, 2017—one day after his request for FMLA leave was formally denied. (Termination Letter, ECF No. 52-25.)

## STANDARD OF REVIEW

Rule 56 of the Federal Rules of Civil Procedure provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is material if it 'might affect the outcome of the suit under the governing law.'" *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A genuine dispute over a material fact exists "if the evidence is such that a

reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. When considering a motion for summary judgment, a judge's function is limited to determining whether sufficient evidence exists on a claimed factual dispute to warrant submission of the matter to a jury for resolution at trial. *Id.* at 249. Trial courts in the Fourth Circuit have an "affirmative obligation . . . to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993)).

In undertaking this inquiry, this Court must consider the facts and all reasonable inferences "in the light most favorable to the nonmoving party." *Libertarian Party of Va.*, 718 F.3d at 312; *see also Scott v. Harris*, 550 U.S. 372, 378 (2007). This Court "must not weigh evidence or make credibility determinations." *Foster v. Univ. of Md.-Eastern Shore*, 787 F.3d 243, 248 (4th Cir. 2015) (citing *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007)); *see also Jacobs v. N.C. Admin. Off. of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015) (explaining that a trial court may not make credibility determinations at the summary judgment stage). Indeed, it is the function of the factfinder to resolve factual disputes, including issues of witness credibility. *See Tolan v. Cotton*, 134 S. Ct. 1861, 1866–68 (2014).

## ANALYSIS

"[T]he ultimate question in every employment discrimination case . . . is whether the plaintiff was the victim of intentional discrimination." *Hill v. Lockheed Martin Logistics Mgmt.*, 354 F.3d 277, 286 (4th Cir. 2004) (en banc) (quoting *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 153 (2000)). To avert summary judgment, Buckmaster must either (a) provide direct evidence that discrimination motivated the challenged employment decision; or (b) apply the

three-step burden-shifting framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), to establish that the employer's proffered reason for the decision was a pretext for unlawful discrimination. *Hill*, 354 F.3d at 284–86; *accord Raytheon Co. v. Hernandez*, 540 U.S. 44, 50–52 (2003). The first method of proof requires "evidence of conduct or statements that both reflect directly on the alleged discriminatory attitude and . . . bear directly on the contested employment decision." *Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510, 520 (4th Cir. 2006) (quoting *Taylor v. Virginia Union Univ.*, 193 F.3d 219, 232 (4th Cir. 1999) (en banc). The second method applies "where a plaintiff does not present sufficient direct or circumstantial evidence showing that an adverse employment action was motivated by intentional discrimination." *Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016). Such is the case here.

As the United States Court of Appeals for the Fourth Circuit articulated in *Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208 (4th Cir. 2016), the *McDonnell Douglas* framework requires a three-step analysis:

> (1) the plaintiff must first establish a prima facie case of employment discrimination or retaliation; (2) the burden of production then shifts to the employer to articulate a non-discriminatory or non-retaliatory reason for the adverse action; (3) the burden then shifts back to the plaintiff to prove by a preponderance of the evidence that the stated reason for the adverse employment action is a pretext and that the true reason is discriminatory or retaliatory.

828 F.3d 208, 206; *accord Jones v. Lowe's Co., Inc.*, 845 F. App'x 205, 213 (4th Cir. 2021); *Spencer v. Virginia St. Univ.*, 919 F.3d 199, 208 (4th Cir. 2019); *Abilt v. CIA*, 848 F.3d 305, 315 (4th Cir. 2017). Additionally, a plaintiff cannot rely solely "on his 'own assertions of discrimination'" to establish pretext at the summary judgment stage. *Adam v. Trs. Of Univ. of N.C. Wilmington*, 640 F.3d 550, 560 (4th Cir. 2011). Rather, the plaintiff must set forth specific, admissible evidence

to show that the employer's proffered reason is false, and that it is a pretext for discrimination or retaliation. *Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 252 (4th Cir. 2015) (citing *Jimenez v. Mary Wash. Coll.*, 57 F.3d 369, 378 (4th Cir. 1995)).

Buckmaster claims that his termination violates four antidiscrimination statutes: (a) the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*; (b) the Family and Medical Leave Act, 29 U.S.C. § 2601 *et seq.*; (c) the Maryland Fair Employment Practices Act, Md. Code Ann., State Gov't § 20-601 *et seq.*; and (d) the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq.* He further claims that Amtrak retaliated against him for exercising his rights under each statute. Amtrak argues that Buckmaster was terminated for legitimate nondiscriminatory reasons—specifically, his deficient performance and his failure to provide documentation to support his extended leave of absence—as supported by various emails and documents in the record. Buckmaster counters that these reasons are pretextual but relies solely on his own deposition and discovery responses to support his position. Discovery having now been completed, and the plaintiff accorded all favorable inferences, his claim cannot survive a motion for a summary judgment.

## I.     Disability Discrimination Claims

The Americans with Disabilities Act provides that no employer may "discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). As both parties note, the Maryland Fair Employment Practices Act and the federal Rehabilitation Act contain functionally identical prohibitions and are evaluated under the same framework as the ADA.

*See Miller v. Maryland Dep't of Nat. Res.*, 813 F. App'x 869, 874 (4th Cir. 2020); *Peninsula Reg'l Med. Ctr. v. Adkins*, 448 Md. 197, 218–19 (Md. 2016) (Maryland FEPA); *Works v. Colvin*, 93 F. Supp. 3d 405, 414 (D. Md. 2015) (Rehabilitation Act).[3] Accordingly, these claims will be analyzed in unison.

Buckmaster raises two theories of discrimination: (a) wrongful discharge; and (b) failure to make reasonable accommodations. Amtrak counters that Buckmaster is not "disabled" within the contemplation of the ADA. Even if Buckmaster is disabled, Amtrak contends that no reasonable jury could conclude that Amtrak's stated reasons for Buckmaster's termination are pretextual, and that Buckmaster's failure to engage in the interactive process precludes his accommodation claim. Although Buckmaster falls within the ADA's protected class, each of his substantive claims fail as a matter of law.

A. <u>Eligibility for Relief</u>

As a threshold matter, Buckmaster's ADA claims require him to demonstrate that he is within the ADA's protected class, requiring that: (1) he had a disability at the time of the adverse action; and (2) he was qualified to perform the essential functions of his position. *Rubino v. New Acton Mobile Indus., LLC*, 44 F. Supp. 3d 616, 622 (D. Md. 2014); *see Haulbrook v. Michelin North Am.*, 252 F.3d 696, 702–03 (4th Cir. 2001) (wrongful discharge); *Evans v. Potter*, RDB-02-4043, 2003 WL 24085317, at *4 (D. Md. 2003) (failure to accommodate). The ADA

---

[3] Amtrak contends that this case should be evaluated under the rubric of the Pennsylvania Human Relations Act, rather than the Maryland Fair Employment Practices Act. Nevertheless, Pennsylvania's statute is adjudicated under the same rubric as the Maryland Fair Employment Practices Act, the ADA, and the Rehabilitation Act. *Rinehimer v. Cemcolift, Inc.*, 292 F.3d 375, 382 (3d Cir. 2002). Accordingly, it is unnecessary to address Amtrak's choice of law contentions, as the same standard applies regardless of whether Maryland or Pennsylvania law governs.

defines "disability" to include: "(1) 'a physical or mental impairment[4] that substantially limits one or more major life activities' (the 'actual-disability' prong); (2) 'a record of such impairment' (the 'record-of' prong); or (3) 'being regarded as having such an impairment' (the 'regarded-as' prong)." *Summers v. Altarum Inst., Corp.*, 740 F.3d 325, 328 (4th Cir. 2014) (citing 42 U.S.C. § 12101(1)). A "qualified individual" is "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(a)(8).[5] Amtrak contends that Buckmaster fails to establish either a qualifying disability, or his ability to perform the essential functions of his position.

First, Amtrak insists that the undisputed facts show Buckmaster is not legally disabled. This contention fails. Both parties acknowledge that Buckmaster suffers from back pain and kidney stones. (Buckmaster Dep. 92:8–11; Mem. Supp. 12–13.) Buckmaster notes that his back

---

[4] Applicable regulations define "physical or mental impairment" to include "[a]ny physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more body systems, such as neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genitourinary, immune, circulatory, hemic, lymphatic, skin, and endocrine." 29 C.F.R. § 1630.2(h)(1). Whether an individual is "substantially limited" requires an "individualized assessment," *id.* § 1630.2(j)(1)(iv), evaluating "as compared to most people in the general population, the condition under which the individual performs the major life activity; the manner in which the individual performs the major life activity; and/or the duration of time it takes the individual to perform the major life activity, or for which the individual can perform the major life activity." *Id.* § 1630.2(j)(4)(i).

[5] The "essential functions" of an employment position are defined by regulation as the "fundamental job duties" of the position. 29 C.F.R. § 1630.2(n)(1). These duties must "bear more than a marginal relationship to the job at issue." *Tyndall v. Nat'l Educ. Ctrs., Inc.*, 31 F.3d 209, 213 (4th Cir. 1994). "A job function may be considered essential because, among other reasons, the position exists to perform that function, there are a limited number of employees to whom that function can be assigned, or the function is so specialized that the employee was hired specifically to perform it." *Hill v. Verizon Md., Inc.*, No. RDB-07-3123, 2009 WL 2060088, at *9 (D. Md. July 13, 2009); *see also* 42 U.S.C. § 12111(8) (instructing courts to consider the employer's judgment regarding essential functions, and look to any written job description); 29 C.F.R. §§ 1630.2(n)(1)–(n)(2) (providing factors for a court to examine when determining whether a job function is essential).

pain "constitutes an impairment under the ADA that substantially limits one or more major life activities," (Resp. Opp. 14), a contention supported by Buckmaster's inability to drive long distances or sit in one position for an extended period of time. (Buckmaster Dep. 93:9–12, 94:14–17.). Additionally, Buckmaster offers evidence that Amtrak is aware of this disability, as Amtrak arranged for his April 2012 surgery at the Laser Spine Center, (*id.* 97:15–24; Back Pain Emails, ECF Nos. 52-3, 52-4), and has previously accommodated his back condition by granting him FMLA leave after his accident and reassigning him to a less strenuous position, (Buckmaster Dep. 84:8–12, 84:21–23, 85:1–6; Transfer Emails, ECF No. 52-5; 2012 FMLA Approval, ECF No. 51-2 Ex. 7). On these facts, a reasonable juror could conclude that Buckmaster is legally disabled under either the "actual-disability" or "regarded-as" prongs.

Second, Amtrak argues that Buckmaster is not a "qualified individual," as he was not performing his job at a level that met Amtrak's legitimate expectations. (Mem. Supp. 12–14.) This argument conflates Buckmaster's eligibility for relief under the ADA with the substantive requirements for a discriminatory termination claim. The former turns on Buckmaster's ability to perform the basic functions of his position; the latter turns on whether he was performing adequately at the time of his termination. *Cf. Haulbrook v. Michelin N. Am., Inc.*, 252 F.3d 696, 702 (4th Cir. 2001) (articulating elements of wrongful discharge). Buckmaster attested in his depositions that he is capable of performing the Safety Trainer role, and this allegation is supported by his reassignment and promotion. (Buckmaster's First Interrog. Ans. No. 16; *see also* Transfer Emails.) Whether he was performing that role at a level that met Amtrak's legitimate expectations is relevant to the merits of his wrongful discharge claim, but it does not undermine his eligibility to seek relief. Accordingly, Buckmaster has proffered sufficient

evidence that he is disabled, and that he is a qualified individual able to perform the essential functions of his position.

B.  <u>Discriminatory Termination Claim</u>

Buckmaster first claims that Amtrak discriminated against him by terminating him on the basis of his disability. A prima facie case for wrongful discharge requires Buckmaster to show that: "(1) he is within the ADA's protected class; (2) he was discharged; (3) at the time of his discharge, he was performing the job at a level that met his employer's legitimate expectations; and (4) his discharge occurred under circumstances that raise a reasonable inference of unlawful discrimination." *Coursey v. Univ. of Md. E. Shore*, 577 F. App'x 167, 174 (4th Cir. 2014) (citing *Haulbrook v. Michelin N. Am., Inc.*, 252 F.3d 696, 702 (4th Cir. 2001)); *Harris v. Reston Hosp. Ctr., LLC*, 523 F. App'x 938, 947 (4th Cir. 2013) (per curiam); *EEOC v. Manu. & Traders Tr. Co.*, 429 F. Supp. 3d 89, 117 (D. Md. 2019). This *prima facie* case includes an implicit causation element: To support a wrongful discharge claim, the plaintiff's disability must be a "but-for" cause of his termination. *Gentry v. E.W. Partners Club Mgmt. Co., Inc.*, 816 F.3d 228, 235–36 (4th Cir. 2016).

As an initial matter, Buckmaster offers no evidence, beyond his self-serving deposition and discovery responses, that could "raise a reasonable inference of discrimination"—let alone show that his disabilities were the "but for" cause of his discharge. *Gentry*, 816 F.3d at 235–36; *Coursey*, 577 F. App'x at 176. Even if he had, the record suggests that Buckmaster was not "performing the job at a level that met his employer's legitimate expectations." *Coursey*, 577 F. App'x at 174. Buckmaster was issued a counseling statement for tardiness and dishonesty in March 2017, after responding to McCarthy about his tardiness on McCarthy's first day in the

office. (First Counseling Statement, ECF No. 52-7.) He received a final warning in May 2017 after failing to improve his performance. (Second Counseling Statement, ECF No. 52-8.) Furthermore, Amtrak proffered an incident list and supporting documents detailing multiple occasions on which Buckmaster came to work late, left early, falsified rosters for his training classes, and provided misleading information to his trainees. (McCarthy Decl. ¶ 13; Incident Notes, ECF No. 51-6 Ex. 3.) Although Buckmaster insists he was "an excellent employee," and that Amtrak employees fabricated their concerns with his performance, (Resp. Opp. 1), these assertions are unsupported by evidence and insufficient to survive summary judgment. Having failed to create a genuine dispute of material fact as to discrimination or performance, Buckmaster cannot make out a *prima facie* case for wrongful termination.

Even if Buckmaster could establish a *prima facie* case, Amtrak has produced undisputed evidence of a nondiscriminatory reason for his discharge. *See EEOC v. Town & Country Toyota, Inc.*, 7 F. App'x 226, 232 (4th Cir. 2001) ("Once the plaintiff states a prima facie case of disability discrimination, the burden shifts to the employer to offer a legitimate, non-discriminatory reason."). It is undisputed that Buckmaster was terminated after fifty-eight days of unexcused, paid absence, and that he failed to fulfill his obligation under Amtrak policy to provide his Certification of Medical Leave and accompanying documentation no later than October 28, 2017. (Termination Letter, ECF No. 52-25.) It is also undisputed that Amtrak countenanced Buckmaster's delays by granting him an extension until November 10, 2017, and warning him that a continued failure to provide documentation could result in discipline or termination. (McCarthy-Battle Email, ECF No. 52-16.) This evidence is sufficient to rebut any *prima facie* case and overcome the presumption of discrimination.

Buckmaster fails to show that Amtrak's reason is pretext for discrimination. A litigant cannot rely on "unsubstantiated allegations and bald assertions" at the summary judgment stage. *Evans v. Tech. Applications & Servs. Co.*, 80 F.3d 954, 960 (4th Cir. 1996); *accord Irani v. Palmetto Health*, 767 F. App'x 399, 419–20 (4th Cir. 2019); *Baldwin v. England*, 137 F. App'x 561, 564 (4th Cir. 2005). Accordingly, a plaintiff alleging employment discrimination under *McDonnell Douglas* cannot rely solely on his "own assertions of discrimination" to demonstrate that the proffered justification for his termination is pretextual. *Vannoy v. Fed. Rsrv. Bank of Richmond*, 827 F.3d 296, 305 (4th Cir. 2016); *Adams v. Trustees of the Univ. of N.C.-Wilmington*, 640 F.3d 550, 560 (4th Cir. 2011). Rather, a plaintiff must either provide evidence suggesting that the employer's proffered reason is "unworthy of credence," or offer additional circumstantial evidence that is probative of discrimination. *Mereish v. Walker*, 359 F.3d 330, 336 (4th Cir. 2004) (quoting *Texas Dep't of Cnty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981)). Buckmaster fails to carry this burden.

Buckmaster makes several allegations that Amtrak's reliance on his lack of FMLA certification is pretextual. Among them, he claims that: (1) his physician faxed all requested documentation to Amtrak; (2) he did not receive the notice sent by Amtrak on November 20; (3) Amtrak's Leave Management had assured him that he "would be fine" if he submitted his documentation in December, following his appointment on December 16, 2021; (4) McCarthy openly acknowledged that Amtrak was discriminating against him; and (5) the counseling statements and other notices of deficient performance he received were part of an effort to fabricate a reason for his discharge. (Resp. Opp. 10, 19, 22, 28–29, 30.) These claims are grounded entirely in Buckmaster's deposition and discovery responses and are unsupported

by the record. *Cf. Evans*, 80 F.3d at 960 ("Evans's unsubstantiated allegations and bald assertions concerning her own qualifications and the shortcomings of her co-workers fail to prove TAS's explanation or show discrimination."); *Goldberg v. B. Green & Co., Inc.*, 836 F.2d 845, 848 (4th Cir. 1988) ("Goldberg's own naked opinion, without more, is not enough to establish a prima facie case of age discrimination.").

Buckmaster also contends that Amtrak was "yearning to get rid of [him]," offering email chains in which his manager asked human resources whether he could be terminated, and Amtrak employees discussed the possibility of termination well before he sought leave. (Resp. Opp. 20–21; Termination Request, ECF Nos. 52-12, 55.) This evidence does nothing to help Buckmaster. The relevant emails detail that Amtrak had substantial concerns with his performance—including issues of tardiness, competence, and dishonesty—more than six months prior to his termination. (Termination Emails, ECF Nos. 57-1, 58 *SEALED*.) To the extent Amtrak and its employees were "yearning to get rid of" Buckmaster, the email chain and incident list suggests that they were motivated by legitimate concerns with his job performance and his integrity—not by unlawful discrimination on the basis of disability. Accordingly, Amtrak's Motion for Summary Judgment is **GRANTED** as to Buckmaster's wrongful termination claim.

### C. Failure to Accommodate Claim

The Americans with Disabilities Act defines discrimination to include an employer's failure to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability." 42 U.S.C. § 12112(a). A *prima facie* failure to accommodate claim requires Buckmaster to show: "(1) that he was an individual who had

a disability within the meaning of the statute; (2) that the employer had notice of his disability; (3) that with reasonable accommodation he could perform the essential functions of the position; and (4) that the employer refused to make such accommodation." *Wirtes v. City of Newport New*s, 996 F.3d 234, 238–39 (4th Cir. 2021); *Wilson v. Dollar Gen. Corp.*, 717 F.3d 337, 345 (4th Cir. 2013); *Young v. Giant Food Stores, LLC*, 108 F. Supp. 3d 301, 318–19 (D. Md. 2015).

"The plaintiff bears the burden of identifying an accommodation that would allow a qualified individual to perform the job, as well as the ultimate burden of persuasion with respect to demonstrating that such an accommodation is reasonable." *Shin v. Univ. of Md. Med. Sys. Corp.*, 369 F. App'x 472, 481 (4th Cir. 2010); *accord U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 401–02 (2002); *Perdue v. Sanofi-Aventis U.S., LLC*, 999 F.3d 954, 959–60 (4th Cir. 2021); *Jacobs v. N.C. Admin. Off. of the Cts.*, 780 F.3d 562, 581 (4th Cir. 2015). "A reasonable accommodation is one that is feasible or plausible." *Reyazuddin v. Montgomery Cty.*, 789 F.3d 407, 414 (4th Cir. 2015).[6] "Although determination of the reasonableness of a proposed modification is often fact-specific, a court may grant summary judgment in favor of a defendant if the plaintiff fails to present evidence from which a jury may infer that the accommodation is 'reasonable on its face, *i.e.*, ordinarily or in the run of cases.'" *Halpern v.*

---

[6] The term "reasonable accommodation" encompasses "[m]odifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable an individual with a disability . . . to perform the essential functions of that position." *EEOC v. Womble Carlyle Sandridge & Rice, LLP*, 616 F. App'x 588, 593 (4th Cir. 2015) (citing 29 C.F.R. § 1630.2(o)(1)(ii)) (alterations in original). A requested accommodation may be found reasonable if it involves "reallocating or redistributing nonessential, marginal job functions," *id.* (quoting 29 C.F.R. § 1630.2(o)), but will generally be unreasonable if it would require the employer to "reallocate job duties in order to change the essential functions of a job," *Shin*, 369 F. App'x at 482 (quoting 29 C.F.R. § 1630.2(o)).

*Wake Forest Univ. Health Sci.*, 669 F.3d 454, 464 (4th Cir. 2012) (quoting *Barnett*, 535 U.S. at 401–02); *accord Perdue*, 999 F.3d at 960 (holding that a plaintiff must establish reasonableness to carry their burden at the summary judgment stage).

Moreover "[n]ot every job-related request by a disabled employee that is denied by her employer will subject the employer to liability for failure to provide a reasonable accommodation." *Fierce v. Burwell*, 101 F. Supp. 3d 543, 550 (D. Md. 2015). Accordingly, a plaintiff must establish "a causal relationship . . . between the disability and the request for accommodation" by adducing evidence that "the requested accommodation was necessary for him to perform the essential functions of his job." *Gaines v. Runyon*, 107 F.3d 1171, 1175 (6th Cir. 1997); *accord Kande v. Dimensions Health Corp.*, No. GJH-18-2306, 2020 WL 7054771, at *8 (D. Md. Dec. 2, 2020).

Accepting that Buckmaster is a qualified individual, he offers no evidence as to the reasonableness or necessity of the accommodations he requested. Buckmaster claims that he requested three accommodations to allow him to perform his role in light of his disability. Specifically, he contends that he asked Amtrak to: (1) hire a second trainer to assist with his classes; (2) allow him to work remotely; (3) guarantee that he would not be required to stand for extended periods of time or drive for at least 50% of his employment. (Resp. Opp. 6.) Buckmaster's request for a second trainer is unreasonable, as the ADA does not compel employers to "hire an additional person to perform an essential function of a disabled employee's position." *Shin*, 369 F. App'x at 482 (quoting *Martinson v. Kinney Shoe Corp.*, 104 F.3d 683, 687 (4th Cir. 1997)). Although his remaining requests are not *per se* unreasonable, he offers no evidence as to how that these requests would be reasonable for Amtrak to provide,

or why they are necessary to perform the essential functions of his role. Accordingly, summary judgment is **GRANTED** as to Buckmaster's failure to accommodate claim.

## II.     Family and Medical Leave Act Interference Claim

"The FMLA entitles eligible employees to take twelve weeks of leave during any twelve-month period for a 'serious health condition that makes the employee unable to perform the functions' of his job." *Vannoy v. Fed. Reserve Bank of Richmond*, 827 F.3d 296, 301 (4th Cir. 2016) (quoting 29 U.S.C. § 2612(a)(1)(D)). "To establish unlawful interference with an entitlement to FMLA benefits, an employee must prove that: (1) []he was an eligible employee; (2) [his] employer was covered by the statute; (3) []he was entitled to leave under the FMLA; (4) []he gave [his] employer adequate notice of [his] intention to take leave; and (5) the employer denied [him] FMLA benefits to which []he was entitled." *Sherif v. Univ. of Md. Med. Ctr.*, 127 F. Supp. 3d 470, 477 (D. Md. 2015). The employee must also demonstrate that "the violation prejudiced [him] in some way." *Anderson v. Discovery Commc'ns, LLC*, 517 F. App'x. 190, 197–98 (4th Cir. 2013). In the present case, there is no dispute that Amtrak is covered by the FMLA, that Buckmaster was an eligible employee, that he provided notice of his intention to take leave, and that he was terminated. Instead, the parties solely dispute whether Buckmaster was entitled to leave under the FMLA and whether he was entitled to FMLA benefits in light of his failure to provide medical documentation for fifty-eight days of unexcused, paid absence.

There are certain requirements that an employee must fulfill in order to be "entitled to leave under the FMLA." As relevant here, an employee must provide an employer with notice of leave "as soon as practicable under the facts and circumstances of the particular case," 29 C.F.R. § 825.303(a), including "sufficient information for an employer to reasonably determine

whether the FMLA may apply to the leave request," *id.* § 825.303(b); *see, e.g. Greene v. YRC*, 987 F. Supp. 2d 644, 653 (D. Md. 2013) ("Calling in 'sick' without providing more information will not be considered sufficient notice to trigger an employer's obligations under the act." (quoting 29 C.F.R. § 825.303(b)); *Rodriguez v. Smithfield Packing Co., Inc.*, 545 F. Supp. 2d 508, 522 (D. Md. 2008) ("An employee must give[] some level of detail regarding the nature of the illness and the likely duration of the absence."). Moreover, an employer may require an employee to provide "a certification issued by the health care provider of the eligible employee." 29 U.S.C. § 2613(a).[7] To comply with DOJ regulations, the employer must inform the employee of the consequences of failing to provide this certification, and must allow the employee fifteen calendar days to request leave and seven to cure deficiencies. 29 C.F.R. §§ 825.305(a)–(c).

A plaintiff who fails to provide the requisite notice and certification cannot sustain an FMLA claim. In *Ahmed v. Salvation Army*, No. CCB 12-707, 2012 WL 6761596 (D. Md. Dec. 28, 2012), the plaintiff brought an FMLA claim against the Salvation Army for denying her request for leave to receive open heart surgery. 2012 WL 6761596, at *1. Ahmed submitted her request on November 6, 2010, alongside a medical certification that "was left largely blank" and had not been completed by her health provider. *Id.* at *2. The Salvation Army notified her of these deficiencies, and she submitted another certification that failed to correct them. *Id.* at **2–3. After three additional warnings and extensions, and following twenty-three days of unapproved absence, the Salvation Army terminated Ahmed on December 29, 2010. *Id.* at *4.

---

[7] A certification must include: "the date on which the serious health condition commenced; its probable duration; the 'appropriate medical facts,' within the health care provider's knowledge, regarding this condition; and a statement that the employee is unable to perform the functions of his position." *Rhoads*, 257 F.3d at 383; 29 U.S.C. § 2613(b)(1)-(3), (4)(B).

This Court granted the defendant's motion for summary judgment: As Ahmed's certification was incomplete, and the Salvation Army had fulfilled its regulatory obligation to provide notice of the deficiencies and the consequences of failing to correct them, "[t]he Salvation Army's duty to provide FMLA leave was never triggered, and Ms. Ahmed was not entitled to protections under the FMLA." *Id.* at \*8.

The same principle is dispositive in this case. Buckmaster was terminated on November 30, 2017, after fifty-eight days of unapproved absence with full pay, multiple warnings, and an extension. He stopped attending work on October 2, 2017, and requested leave for kidney stones on October 6, 2017. (McCarthy Decl. ¶¶ 16-17; McCarthy Dep. 22:2–23:3; Request for Leave, ECF No. 52-9.) Amtrak informed Buckmaster of his obligation to complete a "Certification of Health Care Provider" on October 13, 2017, due fifteen calendar days later, on October 28, 2017. (FMLA Eligibility Notice, ECF No. 51-3 Ex. 4.) *Cf.* 29 C.F.R. §§ 825.305(a), (c). After Buckmaster notified Amtrak of his insurance difficulties and his pending appointments, Amtrak extended this deadline to November 10, 2017. (Extension Request Email, ECF No. 52-19; McCarthy-Battle Email, ECF No. 52-16.) Throughout this process, Amtrak advised Buckmaster that a failure to provide a completed Certification of Health Care Provider could result in disciplinary action consistent with Amtrak's attendance policies. (Warner Decl. 000270; Documentation Warning Email; *see also* Buckmaster Dep. Ex. 7, 8.) In so doing, Amtrak fulfilled its regulatory obligations under the FMLA. Absent a completed certification, Amtrak was not required to do more.

Buckmaster contends that he fulfilled Amtrak's requirements for FMLA certification, claiming that his doctor faxed the completed Certification to Amtrak on November 16, 2017.

In support, he attaches a completed Certification of Health Care Provider, but provides no evidence of transmittal. (Certification, ECF No. 52-10.) Regardless of whether this form was submitted,[8] it was signed on November 18, 2017—far beyond Amtrak's statutory obligations, and a full eight days after Amtrak's extended deadline. (*Id.*); *accord* 29 C.F.R. §§ 825.305(a), (c). Accordingly, the undisputed record indicates that Buckmaster failed to submit his form in compliance with Amtrak's instructions, and that Amtrak consistently warned him of the consequences of failing to do so. In these circumstances, "[Amtrak's] duty to provide FMLA leave was never triggered," *Salvation Army*, 2012 WL 6761596, at *8, and Buckmaster has not shown his entitlement to FMLA leave.[9] Amtrak's Motion for Summary Judgment is therefore **GRANTED** as to Buckmaster's FMLA interference claim.

## III. Retaliation Claims

Title VII of the Civil Rights Act, which incorporates the ADA and the FMLA, makes it unlawful "for an employer to discriminate against any of his employees . . . because [she] has opposed any practice made an unlawful employment practice by [Title VII]." 42 U.S.C. § 2000e-3(a); 42 U.S.C. 12203(a); *see also Savage v. Maryland*, 896 F.3d 260, 276 (4th Cir. 2018). Under either statute, a *prima facie* case for retaliation requires Buckmaster to establish that "(1) [he] engaged in a protected activity; (2) [his] employer acted adversely against [him]; and (3)

---

[8] It is unclear whether this form was submitted at all. Buckmaster claims to possess a fax coversheet as proof that Dr. Kelley transmitted his completed Certification of Health Care Provider to Amtrak, (Buckmaster Dep. 119:4–24, 122:5–123:5), but Buckmaster did not produce this coversheet during the discovery process, despite direct requests from counsel by Amtrak, (*id.* at 123:21 – 124:14; Deposition Followup, ECF No. 51-8.) Moreover, the form is signed and dated November 18, 2017, while Buckmaster claims that it was submitted on November 16, 2017. (Certification.)

[9] Buckmaster contends that Amtrak assured him that he could submit his documentation in December. (Resp. Opp. 21.) Once more, he offers no record evidence in support of this allegation. (*Id.*) Moreover, the FMLA does not require employers to grant indefinite extensions whenever an employee's certification may be forthcoming.

[his] protected activity was causally connected to [his] employer's adverse action." *Rhoads v. FDIC*, 257 F.3d 373, 392 (4th Cir. 2001); *Vannoy v. Reserve Bank of Richmond*, 827 F.3d 296, 304 (4th Cir. 2016) (FMLA); *Reynolds v. Am. Nat. Red Cross*, 701 F.3d 143, 154 (4th Cir. 2012) (ADA). "If the defendant advances a lawful explanation for the alleged retaliatory action, the plaintiff must demonstrate that the defendant's reason for taking the adverse employment action was pretextual." *Adams v. Anne Arundel Cnty. Pub. Sch.*, 789 F.3d 422, 429 (4th Cir. 2015). To carry this burden, a plaintiff "cannot rely upon 'mere speculation or the building of one inference upon another.'" *Sharif v. United Airlines, Inc.*, 841 F.3d 199, 204 (4th Cir. 2016) (quoting *Othentec Ltd. v. Phelan*, 526 F.3d 135, 140 (4th Cir. 2008)).

Buckmaster suggests that discharge was retaliation for one of two protected activities: (1) his request for leave under the FMLA; or (2) his disability accommodation requests under the ADA. *See Haulbrook*, 252 F.3d at 706 (holding that a request for reasonable accommodation constitutes "protected activity"); *Sherif v. Univ. of Md. Med. Ctr.*, 127 F. Supp. 3d 470, 481–83 (D. Md. 2015) (observing that a request for FMLA leave constitutes "protected activity"). Nevertheless, Buckmaster fails to produce any evidence of a causal connection between each alleged protected activity and his employer's adverse action—his termination. Moreover, he fails to demonstrate that Amtrak's lawful explanation for his discharge was pretextual. Accordingly, both claims fail.

Buckmaster's ADA retaliation claim fails for a total lack of evidence of causation. (*See* Resp. Opp. 29.) Buckmaster claims that "[his] termination occurred shortly after his several complaints regarding his disability and requests for accommodation, . . . in approximately July or August 2017," and alleges that the temporal proximity between these events "gives rise to

a sufficient inference of causation." (*Id.* at 29–30.) However, even assuming Buckmaster requested accommodations in August 2017, his termination occurred on November 30, 2017—approximately three months later. This temporal relationship is "too tenuous to support a reasonable inference of causation." *Ali v. BC Architects Engineers, PLC*, 832 F. App'x 167, 173 (4th Cir. 2020); *accord Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273–74 (2001) ("The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality . . . uniformly hold that the temporal proximity must be 'very close.'").

Buckmaster's FMLA retaliation claim fails in light of his failure to timely provide the requested medical certification. "It is well established that discharging an employee who fails to report to work is a valid, nondiscriminatory reason for termination." *Sherif*, 127 F. Supp. 3d at 482 (quoting *Wallace v. Rite Aid Corp.*, No. CIV. PJM 10-2190, 2012 WL 366896, at *3 (D. Md. Feb. 1, 2012). As noted above, Buckmaster was discharged after fifty-eight days of paid, unexcused absence. During this time, he failed to timely submit his Certification of Health Care Provider after Amtrak granted an extension and issued several warnings. Accordingly, Amtrak was well within its rights to terminate him.

Moreover, even if Buckmaster could make out a *prima facie* case for retaliation, Amtrak offers a legitimate nondiscriminatory reason for his termination that Buckmaster fails to refute, dispelling any potential inference of retaliation. As "[t]he FMLA does not prevent an employer from terminating an employee for poor performance, misconduct, or insubordinate behavior," *Vannoy*, 827 F.3d at 304–05, "an employee lawfully may be dismissed . . . if the dismissal would have occurred regardless of the employee's request for or taking of FMLA leave." *Greene v.*

*YRC, Inc.*, 987 F. Supp. 2d 644, 655 (D. Md. 2013) (quoting *Arban v. W. Pub. Corp.*, 345 F.3d 390, 401 (6th Cir. 2003)). The record demonstrates that Amtrak was exploring disciplinary options due to legitimate performance concerns at least a full month before Buckmaster stopped attending work on October 2, 2017. (Termination Emails.) Buckmaster argues that Amtrak's counseling statements and incident reports are pretextual, characterizing them as "false write ups" setting forth artificial grounds for his termination, (Resp. Opp. 22, 30), but offers only speculative allegations to advance this assertion, with no support in the record. *See Evans*, 80 F.3d at 960 (holding that a plaintiff cannot rely on "unsubstantiated allegations and bald assertions" to show pretext at the summary judgment stage). As Buckmaster fails to carry his burden to demonstrate pretext, Amtrak's Motion for Summary Judgment is **GRANTED** as to Buckmaster's retaliation claims.

## CONCLUSION

For the foregoing reasons, Amtrak's Motion for Summary Judgment (ECF No. 51) is hereby **GRANTED**, and Judgment is entered in its favor.

A separate order follows.

Date: April 11, 2022

_____/s/_____
Richard D. Bennett
United States District Judge